## Commonwealth v. Zurcher et al.

*E. C. Moon,* for Commonwealth.

*B. H. Marks* and *Carl W. Brueck,* for defendants.

BRAHAM, P. J., fifty-third judicial district, specially presiding, March 14, 1942.—This case was tried without a jury under the provisions of the Act of June 11, 1935, P. L. 319, 19 PS §§786, 788. No rules having been promulgated by the Supreme Court under section 3 of the act, an opinion is not required; but this case is of such importance that a brief opinion supporting the verdict may be of assistance.

Defendants were prosecuted for the crime of obtaining money under false pretenses, the indictment containing 34 counts. Defendants were milk dealers residing in Pittsburgh, Allegheny County, Pa. The persons alleged to have been defrauded were 28 farmers and milk producers residing in Mercer County, Pa. . . . The fourth count charges defendants with representing to the farmers, naming them, that they "were bonded to the Commonwealth of Pennsylvania Milk Control Commission in an amount sufficient to indemnify the said producers against loss and to secure for them payment for the purchase of milk then and there being purchased and to be purchased, to wit, milk of the value of approximately $3,000 a month from the said producers, whereas in truth and in fact the bond to the Commonwealth of Pennsylvania Milk Control Commission was in the sum of $527.50, which was not sufficient bond to indemnify the said producers against loss and to secure payment for them for milk . . ."

The facts are briefly these: These farmers had been selling milk to a dairymen's coöperative and to other outlets but were dissatisfied. They were looking for a new outlet for their milk where they might dispose of their milk for sale in bottles. About the same time defendants were going into the dairy business in Pittsburgh. They bought a plant on credit, equipped it on credit, and began obtaining some milk from brokers

who were buying the milk of the Mercer County farmers. When the brokers were not proving satisfactory defendants sent their own truck up to get the milk. Later the route was sold to a Mr. Stickle and later to a Leo Caldwell. Defendants, finding the Mercer County milk satisfactory, endeavored to secure more. Zurcher, one of the defendants, made trips to Mercer County where, on different occasions, he represented to farmers that defendants were bonded in an amount sufficient to cover all the milk secured from Mercer County. The amount of the bond actually was only $527.50.

In the summer of 1939 the Milk Control Board raised prices but defendants, feeling unwilling to pay the new price, caused a meeting of the farmers to be called at the home of Glenn Montgomery, where the entire matter was discussed and the farmers agreed to forego the advance for a time. At this meeting the farmers endeavored to gain some information concerning the bond but defendants put them off, Zurcher saying that the bond was plenty.

It was the custom of defendants to pay for one month's milk by the 15th of the next month. On November 6, 1939, the milk for the month of September was not paid for and defendants did not have the money in sight to pay for the October milk. Consequently another meeting was called at the Montgomery school house. There defendants explained to the farmers their financial difficulties. The question of a bond was raised and defendants said they had a bond. They said it was the bond required by the Milk Control Board. When asked the amount they gave evasive answers but, when pushed, defendant Sidler finally said they had a bond sufficient to cover the milk which they were obtaining from the Mercer County farmers. The farmers were mollified and continued to supply milk. The milk for November and December was finally paid for but only after much trouble, and the milk for January, February, and March remained substantially unpaid for. . . .

It is necessary to understand the nature of the bond required by the law. The Milk Control Law of April 28, 1937, P. L. 417, sec. 501, as amended by the Act of July 24, 1941, P. L. 443, sec. 15, 31 PS §700j-501, requires each milk dealer to give a bond with surety approved by the commission, with the provision ". . . the bond shall be in a sum equal to the value of the highest aggregate amount of milk purchased, acquired or received by the dealer or handler from producers in any one month during the preceding calendar year . . ." Apparently the bond of defendants was fixed soon after they went into business; thus the amount of their bond was fixed by the commission at a very small amount, namely, $527.50. However, section 506 of the Milk Control Law, 31 PS §700j-506, provides that, if it appears from the dealer's financial statement or from other information obtained by the commission that the bond does not adequately protect the producer, the commission has the right to require an additional security or an additional bond, the sum to be determined by the commission, which shall not exceed more than 50 percent of the highest aggregate amount of milk purchased during any one month during the preceding or current year or in a sum not exceeding by more than 50 percent the amount to be due and owing producers by the dealer on a particular date, whichever sum is greater. It clearly appears from all the evidence that defendants were purchasing from the Mercer County farmers alone milk in the approximate amount of three thousand dollars per month.

Whatever else is true in this case it appears that the Milk Control Board has been most derelict. They are given the right to require full disclosure by dealers. Here was a new dealer obviously in trouble, and yet all through 1939 and up to April of 1940 defendants were allowed to continue with a bond of only $527.50. Albert W. Schiller, a witness for defendants and an employe of the Milk Control Board, disclosed that de-

fendants' loss up to December 1, 1939, was $7,909.56. The Milk Control Board would then have been justified in requiring a bond in at least that amount.

The important matter for us, however, is defendants' knowledge that they were required to have a bond sufficient to cover the amount of milk bought by them in their largest month's business during the preceding year. These statutes furnish the background for the Commonwealth's case.

An initial point was raised by the motion to quash the indictment. Defendants contend that the court does not have jurisdiction because, although the representations, particularly those at the Montgomery school, were made in Mercer County, the milk was delivered to defendants' dairy in Pittsburgh, Allegheny County, citing Commonwealth v. Karpowski, 167 Pa. 225. This contention assumes that when Mr. Stickle or Mr. Caldwell carried the milk into Pittsburgh they did so as agents for the farmers. This is not borne out by the evidence. All the farmers testified that their milk was bought at the milk house. Defendants themselves did admit that they originally sent their own trucks for the milk; then they sold the route to Stickle and later to Caldwell. This status once established would be presumed to continue. To be sure, the farmers were consulted at the meeting on November 6th regarding an increase to be allowed and deducted from their milk checks and they agreed to it. This was merely defendants' method of arriving at the actual net amount to be paid the farmers for their milk. Frederick Zurcher, defendant, testified explicitly that defendants had no agreement with the farmers about hauling the milk. He said that Caldwell insisted upon having a contract with defendants for hauling the milk. Commonwealth's exhibit 3 is the agreement made between defendants and the committee of the farmers on April 10, 1940. This agreement contains the following language:

"Cloverdale agrees to undertake to continue its milk business, and to liquidate all monies due and payable to the various milk producers, including the hauling service furnished to Cloverfield, prior to March 31st, 1940". Note the language, "furnished to Cloverfield".

Clearly the carriers were agents of defendants. Therefore, when defendants' representations were made in Mercer County and the milk was delivered by the various farmers to defendants' carriers in Mercer County, the entire offense was committed there.

To the crime, obtaining money by false pretense, three elements are essential: (1) A false pretense; (2) obtaining property by it; (3) an intent to defraud; and ". . . the correct way to determine whether any particular case falls within it is, not to consider each of these things separately, but to look at them all together; for no case is within the statute unless all of them coexist in it . . .": Commonwealth v. Schmunk, 22 Pa. Superior Ct. 348, 354.

False representations were made by defendants at the meeting at the Montgomery school house on November 6, 1939. This conclusion is inescapable from the evidence. Other and prior misrepresentations were made by Mr. Zurcher when he was soliciting business. Such a statement was made to George Pizor and M. G. Coulter. But at the Montgomery school house both the defendants were there and both at one time or another discussed the matter of the bond. The situation is quite clear. At the Montgomery home in August defendants were asking for leniency. If, for a time, they were not held to the Milk Board prices they could recover their financial equilibrium; so they said. But by November 6th it was apparent that this hope had not been realized. The farmers were becoming insistent; they wanted to know about the bond. At the Montgomery residence it had been possible to put them aside in a jocular way, as Mr. Zurcher did. At the school house, many wanted to know the amount of the

bond. Defendants were skillful enough to parry this inquiry, although they could not help knowing the amount of their own bond. They advanced the statement that they had given a bond as required by the Milk Control Board. This much they admit. But it is clear from the evidence that the farmers would not stop there; they persisted, how much was that? One or both of the defendants said they did not know; they put it off upon the bookkeeper but finally did come out with the statement that they had a bond sufficient to cover the milk which they were securing. This was the false pretense in question. Defendants knew of the falsity of their statement; the farmers did not. Defendants had won their confidence and defendants profited by their credulity. They were buying milk of the value of about three thousand dollars per month; their bond was in the amount of $527.50.

The farmers were deceived. To the average Pennsylvania farmer a surety bond is not a familiar thing. These men were told that under the Milk Control Law defendants were bonded sufficiently to cover their milk. That was the intent of the law. They had a right to assume that the law was being complied with. Defendants knew that they had been the fortunate beneficiaries of surprising inaction on the part of the Milk Control Board. They made the misrepresentation hoping there was enough truth in it to exonerate them. But the statement carried with it the plain implication that the intent of the law had been complied with. This defendants knew to be false. The farmers relied upon it to their hurt. Of course they tried to help defendants out and get their money in any way they could get it; but, with surprising unanimity, the farmers have testified to their reliance upon this bond. One of the defendants testified that the bond was only a small consideration; he discloses his lack of familiarity with farmers by such a statement. Even if the farmers were too easily deceived, defendants are not helped

thereby. As was said in Commonwealth v. Henry, 22 Pa. 253, 256, "Nor is it less a false pretense because the party imposed upon might, by common prudence, have avoided the imposition. . . ." Or, as was said in Commonwealth v. KoEune, 69 Pa. Superior Ct. 176, 181, 182: "The statute was not enacted for the protection of the shrewd and capable only. . . . It is of course, conceivable that a pretense might be so trifling or absurd as to warrant a court in saying that it was not calculated to deceive but where the pretense is such as might well mislead the confiding and unwary a fraud ought not to be ignored because care and circumspection were not exercised by the person imposed on." Commonwealth v. Johnson, 312 Pa. 140, 148.

Did defendants do this with intent to defraud? This is the hard point in the case. We do find it to be true, as defendants have testified, that they did invest their hard-earned money in this business, did strive hard to make it go and did suffer great personal loss; but we have found or must find that they flinched in the crisis. When it came to the point of losing their business in November of 1939, or lying to the farmers, they told an untruth in order to save their business. They knew how desperately they were involved and were familiar enough with business matters to know that, however much they hoped to bring the thing out, they probably would not be able to do so. The thing uppermost in their minds was the necessity to continue getting milk from the Mercer farmers. As was said in Commonwealth v. Henry, supra, we must look upon the question of intent from all the evidence. We can only gather their intent from the things which they did and, seeing the manner in which they went on to the bitter end and caused this huge loss to the farmers, we can only conclude and do find as a fact that they did have the intent to defraud.

Entertaining these views it is inevitable that we find defendants guilty on the second and fourth counts

and upon the counts involving individual producers where there is evidence to sustain such counts.

BRAHAM, P. J., fifty-third judicial district, specially presiding, July 21, 1942.—Defendants after trial before the court without a jury were found guilty of the offense of obtaining money under false pretenses. Motions in arrest of judgment and for a new trial have been presented, argued, and are now before the court en banc for disposition.

The motion in arrest of judgment must be refused. It is sufficient to observe that a motion in arrest of judgment relates only to matters which appear upon the face of the record and does not reach evidence taken during the trial: 2 Sadler Criminal Procedure in Penna. (2d ed.), par. 605.

There are seven reasons advanced in support of a new trial. The principal one is that the verdict was against the weight of the evidence. The attack of defendant on this point centered upon the evidence concerning misrepresentations about the bond. It was stated by counsel for defendants at oral argument that the majority of the farmers who testified did not testify to any false representations concerning a material existing fact. A careful reëxamination of the evidence indicates this contention to be without foundation. The plain implication from this evidence is that defendants falsely represented their purchases of milk from the farmers to be secured by a bond sufficient in amount to cover the value of milk being purchased.

With surprising unanimity the witnesses testified to such false statements. Lamont Smith testified defendants said they had bonds to cover the milk and also said frequently, "We are bonded, you can't lose a dime". Harry Evans' testimony was, "They said it [the bond] was sufficient to take care of us and cover all the milk they were buying". The farmers were told this "plenty of times". Again, "We were told by them it was sufficient to take care of all the milk they were

buying". Leroy McGill said, "I asked them if the money was good and he said it was; he said they were bonded". Again, "Well the fellows asked them if they were bonded and what about the bond and they said they were and they would never lose a dime". Again, "They said it [the bond] will cover your milk". Once more, "And Mr. Zurcher always said, don't be worried boys you'll never lose a dime".

According to Glenn Montgomery, one of the leaders of the farmer group, defendants at the meeting at the Montgomery school house in November of 1939 testified concerning the amount of the bond, "It wasn't answered directly at all. The question was kind of side-stepped, and the amount was evaded entirely as to what it was, any more than they said, 'It will cover the amount of your milk'". Later at the meeting at defendants' plant Montgomery was told not to worry, that the farmers were covered with bond. On cross-examination Mr. Montgomery rejected defendants' contention that all Mr. Sidler stated was "We have got a bond such as the law requires", Montgomery insisting that the thing said was, "We have got a bond to cover the milk". George Davis said on the subject of defendants' representation concerning the amount of the bond, "As near as I can remember that they was bonded and bonded for enough to take care of enough milk that we had in the group". Or "to take care of the milk that they was getting from the group in that community". Again, there was reiteration of the statement that the farmers would not lose a cent.

To Kermit Bowmer defendants stated, "You are bonded boys, you will never lose a dime". Defendants became more explicit. According to him defendants said, "We are bonded for all the milk that you boys can produce". This was in January, February, or March of 1940 when defendants were buying from three to four thousand dollars worth of milk a month and had a bond for about five hundred dollars. Again,

according to Bowmer, defendants said, "Yes we have a bond, we are bonded to cover the milk you boys could produce".

George Pizor said that in the latter part of July defendant Zurcher said to him, "I don't know how much the bond is", he said, "my partner takes care of all that". "But", he said, "there is one thing: We have bond to cover all of the milk we have up here. You fellows", he said, "you will never lose a dime". M. G. Coulter said he was advised by defendant Sidler about the bond in this language: "Yes, he told me when he came up to get the milk we wouldn't lose anything that they carried a bond that could cover the milk". Again, defendant Zurcher said, "He had a bond to cover our milk, we couldn't lose anything".

Leo Caldwell, the truckman, said that Mr. Sidler, in the presence of the two defendants, said, "He didn't know the exact amount [of the bond] but that it was sufficient to cover the amount of milk that they were getting up here". Floyd Fisher said that defendants told him "that they had enough of a bond to cover our milk and we wouldn't lose anything". William Cooper said, "As near as I recall they said they were bonded to cover the amount of milk they were getting". J. E. Jamison said defendants told him, "They were bonded to cover our milk". This was at the Montgomery school house. Albert Chanadet said he heard only that the "Bond was plenty".

As recited in our previous opinion, the Milk Control Law requires the dealer to furnish a bond in a sum equal to the value of the highest aggregate amount of milk purchased, acquired, or received by him in any one month during the preceding term or year, with the further provision that, if it appears from the dealers' financial statement or other information obtained by the commission that the bond does not adequately protect the producers, the commission may require additional security or an additional bond in a sum to be determined by the commission. It must not exceed more

than 50 percent of the highest aggregate amount of milk purchased during any one month during the preceding year nor exceed by more than 50 percent the amount found to be due and owing producers by the dealer. Thus it is the intent of the Milk Control Law to require a bond which may fluctuate in amount with the quantity of milk purchased but which shall be large enough to cover the amount of milk apparently being handled. A careful survey of the evidence indicates it was defendants' settled purpose to make the farmers believe this had been done. There was constant concealment of the actual amount; there was constant reference to the fact that defendants were bonded; there was frequent use of extravagant language such as "You will not lose a dime" and there were frequent statements that the amount of the bond equaled the value of the milk purchased. This is not merely puffing, this was a part of the scheme of false representations necessary to get this milk from the farmers.

The argument on the motion for a new trial developed two new phases of the matter. First, it was strongly argued that defendants were at all times in desperate financial shape, a fact known to the farmers, and the farmers went along with defendants willingly. If this be true, what about all these statements that the farmers would never lose a dime? If defendants were in financial extremities and yet continued to make such representations to the farmers it could only be because they invited the farmers to rely upon the bond.

The second argument developed at the new trial was that defendants did not care whether they got milk from the farmers or not. This is not borne out by the evidence. To be sure, after the first of the year defendants were willing to give up but this was late in the transaction. Earlier, as J. E. Jamison said, "They always wanted our milk". Albert Chadanet said that Zurcher "coaxed for the milk".

The fourth reason for a new trial, namely, that the evidence does not show the false pretense to have been

an assertion of an existing fact, falls with our conclusion on the main assignment. The amount of the bond and its relation to the quantity of milk being produced was an existing fact. We have found defendants to have wilfully misrepresented this fact. Accordingly this reason must be rejected.

Nor is it true, as alleged in the fifth reason for a new trial, that the evidence merely shows defendants to have made promises to perform some act in the future. This might be true of the enthusiastic statements about the farmers never losing a dime. Standing alone such expression could not support the verdict but these statements must be considered in connection with the misrepresentations concerning the amount of the bond with relation to the amount of milk purchased. The sixth assignment falls with the fifth.

The seventh assignment charges that the evidence fails to show any intent on the part of defendants to make false and fraudulent representations. As was said in our previous opinion, this feature of the case has caused some concern. These defendants are very personable gentlemen and very unfortunate. There is much about their situation to excite compassion but we have found, and after a careful review of the case still find, that they did falter in the crisis and did make such false and fraudulent representations concerning their bond as were necessary to continue to get milk from these Mercer County farmers. It was their only hope and they took it. Accordingly we do find that there was the intent to deceive which is a necessary ingredient of the offense. We have reconsidered the case carefully and we do not find any substantial error in the trial nor do we find that the interests of justice require a new trial. Accordingly, we make the following

### Order

Now July 21, 1942, defendants' motion for a new trial is overruled and refused.